IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| SIX KINGDOMS ENTERPRISES, LLC, | § § § | |
| Plaintiff, | § § | EP-10-CV-485-KC |
| v. | § § | |
| THE CITY OF EL PASO, TEXAS, | § § § | |
| Defendant. | | |

## ORDER

On this date, the Court considered Plaintiff's Application for Temporary Restraining Order, ECF No. 1 ("Application"). For the reasons set forth below, the Application is **GRANTED** in part.

## I.    BACKGROUND

### A.    City regulations

Prior to October 2010, the City Code of El Paso, Texas regulated the sale of certain animals within El Paso ("the City"). As relevant here, these regulations required sellers of animals to obtain a permit from the City, Def.'s Ex. 2, at 11 (section 7.24.060 of the 2007 code), subjected them to audits and inspections, *id.* at 3 (sections 7.04.030-.040 of the 2007 code), and required establishments selling dogs to ensure that any dogs sold had received required vaccinations and had been implanted with an identifying microchip. Hearing Transcript ("Transcript") 29.[1] These regulations also prohibited the sale of certain young fowl, young

---

[1]    Transcript citations in this Order are to a preliminary version of the hearing transcript, because the compressed time frame involved in the preparation of this Order did not allow for the preparation of a final version of the transcript. The relevant page numbers of the official transcript will differ.

rabbits, and certain turtles.  Def.'s Ex. 2, at 12 (section 7.24.090 of the 2007 code).  The

regulations further prohibited anyone from changing the natural color of chickens, ducklings,

other fowl, and rabbits.  *Id.* (section 7.04.100 of the 2007 code).

      In October 2010, the City passed ordinance number 017428 ("the ordinance") amending

and expanding upon these regulations.  The City's stated purpose in enacting the ordinance was

to reduce to zero the number of animals euthanized by the City.  Def.'s Ex. 1, at 1 (preamble of

the ordinance, stating the City's goal to become a "no kill" city).  The City stated that it wanted

to reduce the number of animals euthanized because they were unwanted.  *Id.*  The City may

also have wanted to reduce the financial burden on the City of euthanizing thousands of animals,

*id.*, though it performed no studies to determine whether it would cost more to hire four full-time

employees to administer the law than it would cost to continue to current number of

euthanizations.  Tr. 96.  The ordinance was also designed to protect the public from bites and

disease transmission by stray animals, and to make sure animals were treated humanely.  Tr. 85.

      The City found that an appropriate mechanism by which to achieve these goals was to

regulate the sale and transfer of dogs and cats, to "include special provisions regarding the

services of animal welfare organizations," and to restrict breeding practices.  Def.'s Ex. 1, at 1.

The restrictions on the sale or transfer of dogs and cats were designed to remove the profit

incentives to bring more puppies and kittens into the City, because the City found there was

already an excess of those animals.  Tr. 92.  The ordinance was designed to achieve this by

encouraging the adoption for a small fee of currently unwanted pets instead of the purchase of

puppies or kittens.  Tr. 93.  However, the City did no studies of whether animals acquired for

low prices were more likely to be abandoned than those purchased for much higher prices.  Tr.

98.  The City also tried to achieve its goals by providing free and low-cost spaying and neutering

services, requiring vaccinations, animal registration and microchipping, and encouraging

adoption, all as part of a comprehensive attempt to reduce the number of stray animals.  Tr. 104.

At the time the ordinance was enacted, Plaintiff was the only retailer of pets in the City.  Tr. 111.

Substantively, the ordinance requires different permits for animal establishments, animal

welfare organizations, breeders of pure-breed animals or certain types of service animals, and

requires a 'litter permit' for anyone else who intentionally or unintentionally breeds a dog or cat.

Def.'s Ex. 1, at 8 (section 7.14.010 of the new code); *id.* at 12 (section 7.14.050 of the new

code).  It prohibits the sale to the public of any puppy or kitten less than eight weeks old.  *Id.* at

11 (section 7.14.030 of the new code).  The ordinance sets maximum prices that individuals,

retail establishments, and animal welfare organizations may charge for the sale of a dog or cat

that is under one year old.  *Id.* at 9-11 (section 7.04.010(D) of the new code).  The ordinance

does not regulate the sale prices of dogs or cats over one year old.

The maximum price for a puppy or kitten is determined by whether the seller provides, at

the time of sale, documentation of the non-food expenses the seller incurred prior to the sale of

the animal.  *Id.* at 10 (section 7.04.020(E) of the new code).  If the seller provides such

documentation, then the maximum price allowed is the amount of documented costs, plus an

amount equal to the seller's undocumented cost for food.  *Id.* (section 7.04.020(E)(1) of the new

code).  If the seller does not provide such documentation because it "is not available or cannot be

provided to the purchaser or transferee prior to the sale or transfer," the maximum price is $50

for an unaltered dog or cat (meaning one that has not been spayed or neutered), or $150 for an

altered animal.  *Id.* (section 7.04.020(E)(2) of the new code).

Breeders are exempt entirely from the maximum price restrictions, as are individuals

holding litter permits who do not conduct any advertisement for the sale of their animals.  *Id.*

(section 7.04.020(E)(3)(b-c) of the new code). The ordinance became effective on January 1, 2011. *Id.* at 20. However, the ordinance provides an amortization period for retail establishments, exempting from the price restrictions until March 31, 2011 the sale of any animal the retail establishment already possessed on December 31, 2010. *Id.* (section 7.04.020(E)(3)(a) of the new code).

### B.    Plaintiff's operations

In March 2008, Plaintiff opened a pet store in El Paso as a franchise of Petland, Inc. ("Petland"). Tr. 8; Compl. ¶¶ 6-7. Prior to opening the store, Petland investigated the market as part of its due diligence. Tr. 24. The franchise agreement ("Agreement") with Petland requires Plaintiff to sell certain quantities of puppies, rabbits, fish, and guinea pigs, Tr. 7, 8, 32, though Plaintiff's primary business is the sale of puppies, and puppies are the area of its expertise. Tr. 8, 10. There are a a small number of provisions in the Agreement that are relevant to this Order but Plaintiff avers are confidential. Reference to these provisions have been redacted and are available in the sealed Appendix to this Order.  When it first opened, Plaintiff was aware that the sale of pets was regulated by the City. Tr. 24-30

The ordinance effectively prevents Plaintiff from being able to sell puppies. Tr. 15-16. Plaintiff cannot sell puppies under the ordinance except subject to the price controls, because a dog is no longer a puppy when it is over one year old. Tr. 36, 60. Plaintiff cannot disclose its expenses related to the sale of a particular dog because that would require the disclosure of the confidential prices negotiated by Petland, a disclosure prohibited by the Agreement. Tr. 40-41, 75, 78. Even if Plaintiff did provide the documentation, Plaintiff could only sell puppies at cost, without a profit. Tr. 78. Without providing documentation, Plaintiff could only sell puppies at a significant loss, since Plaintiff's transportation costs alone exceed the maximum prices allowable

4

for sale of a puppy.  Tr. 41.  Plaintiff could try to buy its puppies elsewhere, including locally, instead of buying from the Midwest, but Plaintiff has not wanted and does not want to do so due to the limitations created by the franchise agreement.  Tr. 58-59.

After March 31, 2011, when the amortization period expires, under the rules imposed by the ordinance Plaintiff will be financially unable to continue in operation.  Tr. 51.  The sale of puppies constitutes such a large portion of Plaintiff's revenue that if it were deprived of that revenue, Plaintiff could not meet its financial obligations, including those to its lender and its landlord.  Tr. 60-61.  Plaintiff does not know of any product that it could substitute for puppies between the present and March 31, 2011, in order to change its business model and remain financially viable.  Tr. 51-52.  Plaintiff does not know whether it would be legally possible under the Agreement to change its business focus from puppies to something else.  Tr. 35.

Plaintiff's sells puppies, on average, for a price between $1,000 and $1,200.  Tr 61.  The lowest price Plaintiff has ever charged for a dog was $188, and that was because the dog was not selling well and Plaintiff wanted to find a home for the dog.  *Id.*  On December 31, 2010, Plaintiff had about forty-five puppies in its possession.  Tr. 83.  It usually takes Plaintiff approximately three to four months to sell that many dogs.  *Id.*

Plaintiff filed a complaint against the City on December 30, 2010, alleging violations under the Texas and United States Constitutions.  Compl. ¶¶ 24-30.  In the Complaint, Plaintiff requested a temporary restraining order, preliminary injunction, and permanent injunction to prevent the City from enforcing the ordinance against its business.  Compl. ¶¶ 38, 47, 49.  On January 7, 2010, the Court held a hearing on Plaintiff's request for a temporary restraining order, which lasted approximately three to four hours.  At the hearing, Plaintiff indicated it was willing to post a bond to obtain a restraining order against the operation of the ordinance.  Tr. 18.

## II.      DISCUSSION

### A.      Standard

Pursuant to Federal Rule of Civil Procedure 65, any court issuing a restraining order must: "(A) state the reasons why it was issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Fed. R. Civ. P. 65(d).  Although by its terms Rule 65(b) only sets a fourteen-day time limit for restraining orders issued without notice, restraining orders issued with brief, informal notice are also subject the same time constraints. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 432 n.7 (1974); Fed. R. Civ. P. 65(b)(2).

A party seeking injunctive relief must establish that he is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct 365, 374 (2008); *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).

### B.  Analysis

#### 1.      Substantial likelihood of success on the merits

Plaintiff advances one claim under the Texas constitution, specifically the clause proscribing the impairment of contracts.  Compl. ¶ 29.  Plaintiff additionally advances claims under the United States Constitution's Contracts and Commerce Clauses. *Id.* ¶¶ 26, 29.  Plaintiff also alleges that the ordinance violates due process, in that it is vague and ambiguous. *Id.* ¶ 28. Because the Court finds that Plaintiff is entitled to a restraining order based on its Contracts Clause and Commerce Clause claims, the Court does not decide the merits of Plaintiff's causes

of action under the Texas constitution.  With regard to Plaintiff's due process violations based

upon vagueness and ambiguity, the Court finds that Plaintiff has failed to carry the high burden

required to prevail on such claims.  *See Ford Motor Co. v. Tex. Dept. of Transp.*, 264 F.3d 493,

507 (5th Cir. 2001) (quoting *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 n. 2

(5th Cir.1991)).

<ol type="a" start="1"><li>*United States Constitution - Article I, section 10, Contracts Clause*</li></ol>

According to the Contracts Clause, states may not "pass any . . . Law impairing the

Obligation of Contracts."  U.S. Const. art. I, § 10.  The Supreme Court has set forth a three-step

procedure for analyzing federal constitutional claims that a state law impairs contractual

obligations.  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 260 (1978).  "First, the

threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a

contractual relationship."  *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504

(5th Cir. 2001) (quotation marks omitted).  This first step itself has three elements: "whether

there is a contractual relationship, whether a change in law impairs that contractual relationship,

and whether the impairment is substantial."  *General Motors Corp. v. Romein*, 503 U.S. 181, 186

(1992).  In making a determination of substantial impairment, "the court should consider the

expectations of the parties with respect to changes in the law.  Particularly relevant to this

inquiry is whether the subject matter of the contracts had been subject to regulation at the time

the contracts were made . . . .  The court should also consider what terms of the contract are

affected and the duration of the effects."  *Lipscomb*, 269 F.3d at 504 (footnotes and quotation

marks omitted).  "'Total destruction of contractual expectations is not necessary for a finding of

substantial impairment.'"  *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010)

(quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983)).

If there is a substantial impairment, in the second step courts must "examine the state's asserted justification for the impairment, which must be a significant and legitimate public purpose." *Davis*, 602 F.3d at 627. The state must be attempting to remedy "a broad and general social or economic problem." *Energy Reserves Grp.*, 459 U.S. at 412. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id.*; *see also Davis*, 602 F.3d at 631 (finding a violation of the Contracts Clause where a state law was designed to benefit a specific in-state corporation). At this stage, "[t]he scrutiny to which the court subjects the state law is proportional to the degree of impairment." *Lipscomb*, 269 F.3d at 504; *Energy Reserves Grp.*, 459 U.S. at 411.

Third, if the public purpose is adequate, courts then must consider "whether the challenged law was 'reasonably necessary' to achieve the purpose." *Davis*, 602 F.3d at 627 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 260 (1978)); *Energy Reserves Grp.*, 459 U.S. at 412. This inquiry is into "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves Grp.*, 459 U.S. at 412 (quotation marks omitted). "Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* (quotation marks, footnote, and citations omitted); *Lipscomb*, 269 F.3d at 505. However, "[t]his inquiry is more searching than the rational basis review employed in Due Process or Equal Protection analysis," and "'a state must do more than mouth the vocabulary of the public weal in order to reach safe harbor . . . .'" *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, ex*

*rel. Ins. Commissioner of Puerto Rico*, 125 F.3d 9, 13 (1st Cir. 1997) (quoting *McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 16 (1st Cir. 1996) (ellipsis in original)).

Here, Plaintiff has provided evidence that it has a contract with Petland: the Agreement. Plaintiff has also submitted evidence that the ordinance impairs that relationship by preventing it, as a retail establishment, from selling puppies, or by requiring that it provide documentation of confidential expenses to do so.  Plaintiff has shown this by establishing that it cannot continue in business if it sells puppies at the prices mandated by the law without documentation of expenses.  Plaintiff has also established that if it discloses the prices it pays for puppies, such disclosure would reveal confidential prices negotiated by Petland for its franchisees that Plaintiff is prohibited from revealing.  Moreover, based on the evidence before it at this point, the Court finds that the impairment is substantial, because the impairment could lead to the complete loss of the franchise.

A finding of substantial impairment is less likely where a party enters a market that is already heavily regulated.  *Energy Reserves Grp.*, 459 U.S. at 411.  This is because the parties' reasonable expectations about foreseeable changes to the regulatory environment form the backdrop to the contract.  *Davis*, 602 F.3d at 627-28.  While the retail pet market was regulated at the time Plaintiff entered into the Agreement with Petland, it was not so pervasively regulated or regulated specifically in such a way that either party could foresee the possibility of price regulation, or that the primary purpose of the franchise, the sale of puppies, would be impossible to achieve without disclosing the confidential supply prices negotiated by Petland.  *Cf. Energy Reserves Grp.*, 459 U.S. at 416 (previous price regulations made future price regulations foreseeable); *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940) (when one enters a market "already regulated *in the particular to which he now objects*, [one]

9

purchases subject to further legislation upon the *same topic*.") (emphasis added); *see also*

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 894 (7th Cir. 1998) ("Of great, and we

are inclined to say controlling, importance in the determination of whether a law violates the

contracts clause is the foreseeability of the law when the original contract was made . . .").  It

would not have been a rational business investment for either Plaintiff or Petland to open this

franchise in a market subject to potential regulations of the type at issue in this case, and the

Court does not presume that they did so.

Moving to the second step, the adequacy of City's public purpose, there is insufficient

evidence before the Court of a "significant and legitimate public purpose" behind this law.

*Davis*, 602 F.3d at 627.  The evidence currently shows three purposes behind the ordinance: first,

a humane attempt to reduce the number of euthanizations of stray animals, Def.'s Ex. 1, at 1; Tr.

95; second, to reduce the number of stray animals that might bite or transfer disease to City

inhabitants, Tr. 85; and third, to give special treatment and status to animal welfare organizations

at the expense of retailers of pets.[2]  Tr. 103.  The first and second purposes are classic police

power functions — a laudable attempt to reduce the number of euthanizations of stray animals

for humane reasons and also so as to reduce the possibility of bites or transfers of disease to

humans.  Based on the evidence before it, the Court finds credible and does not second guess

those motives.  However, the Court is concerned by the evidence of the ordinance's third

purpose, which appears in the very terms of the ordinance, and was also freely admitted by the

---

[2]       Because there is conflicting evidence about whether the economics of animal euthanasia were a motive behind the ordinance, the City does not include the economic motive as a purpose behind the law.  *Compare* Def.'s Ex. 1, at 1 (preamble of the ordinance, stating the aim of reducing the burdens of euthanizing animals on the City's taxpayers), *with* Tr. 95-96 (City's witness disclaiming any financial motive behind the ordinance, and noting that no cost comparison studies were done).

government witness at the restraining order hearing.  The ordinance gives special treatment to animal welfare organizations at the expense of retail establishments, in the form of privileges granted the former and burdens placed on the latter.  This is uncomfortably close to the exact issue the Supreme Court has cautioned courts to investigate, that is, a legislative body acting to benefit one group of special interests at the expense of another.  *See Energy Reserves Grp.*, 459 U.S. at 412; *Spannaus*, 438 U.S. at 248-249 (noting that the statute at issue there had "an extremely narrow focus," possibility limited to one entity).  Further, the Court is uneasy with the fact that there was only one single retail seller of pets in the City when the ordinance was enacted.  Based on the evidence before it of this questionable third purpose, at this juncture, the Court finds that Plaintiff has shown a sufficient likelihood of success on a claim the City had inadequate justification to interfere with its contract, so that a restraining order is proper.

On the third step, the reasonability and necessity of the means chosen, the Court is mindful of its limited role in reviewing legislation for whether it is necessary to achieve a particular purpose.  *See Energy Reserves Grp.*, 459 U.S. at 412.  However, on the evidence before it at this time, the Court finds that the price-regulating section of the ordinance was not reasonably necessary to achieve the ordinance's proper purposes.  Plaintiff sells approximately 180 puppies per year.  Even if every single puppy sold by Plaintiff for the past year had been picked up by the City as a stray, eliminating those puppies from the pool of stray animals would represent less than one percent of the total number of stray animals picked up by the City in a year.  Further, the City performed no studies, and presented no evidence, that Plaintiff's animals contributed in any way to the problem facing the City.  The ordinance's sections designed to drive the last remaining pet store in the City out of business do not seem necessary to achieve the City's purported goals.

11

Moreover, in light of the fact that Plaintiff was the last pet store in existence, there is insufficient evidence before the Court to explain the specific prices set in the ordinance.  It is not evident to the Court how fewer of Plaintiff's puppies would become strays if they were sold at $50 or $150, as they must be if Plaintiff is to comply with the Agreement, instead of $1,000 or $1,200.  As substantiated by the City's witness at the hearing, simple common sense dictates that when someone buys a puppy for $1,000 or more, that person is less likely to discard it than if the same animal were purchased at one tenth the price.  Tr. 12.  Until there is more evidence to explain the price levels chosen by the City, the Court cannot conclude that the price regulations are necessary to achieve the ordinance's proper purposes.

    b.   *U.S. Constitution - Article I, section 8 - dormant commerce clause*

The United States Constitution grants Congress the power to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8.  From this grant of power to Congress, the Supreme Court has inferred that the same power must have been taken away from the states. *Dickerson v. Bailey*, 336 F.3d 388, 396 (5th Cir. 2003).  "This 'negative aspect' of the Commerce Clause . . . is commonly known as the 'dormant Commerce Clause' doctrine."  *Id.* The Supreme Court has set forth a "two-tiered approach" to determine whether state laws impermissibly interfere with Congress' power to regulate interstate commerce.  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986); *Dickerson,* 336 F.3d at 396.  In the first tier, state statutes that directly regulate interstate commerce or discriminate against out of state interests are usually deemed per se unconstitutional.  *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984); *Dickerson,* 336 F.3d at 396.  Proof of a law's discriminatory nature "may be made on the basis of either discriminatory purpose or discriminatory effect . . ." *Bacchus*, 468 U.S. at 270 (citation omitted).  The only way for such laws to be valid is if the

state "can demonstrate, under rigorous scrutiny, that it has no other means to advance a

legitimate local interest." *Dickerson*, 468 U.S. at 396 (quotation marks omitted).  In fact, a law

that discriminates against out of state interests is generally declared unconstitutional "'without

further inquiry.'"  *Id*. (quoting *Brown-Forman*, 476 U.S. at 579).  In the second tier,

> "[w]here the statute regulates even-handedly to effectuate a legitimate local
> public interest, and its effects on interstate commerce are only incidental, it will
> be upheld unless the burden imposed on such commerce is clearly excessive in
> relation to the putative local benefits.  If a legitimate local purpose is found, then
> the question becomes one of degree. And the extent of the burden that will be
> tolerated will of course depend on the nature of the local interest involved, and on
> whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Here, the evidence Plaintiff has introduced makes out a case, at this stage of the

proceedings, that the ordinance discriminates against interstate commerce.  Plaintiff has

indicated that the cost of transporting puppies from its suppliers to Plaintiff's store in itself

exceeds the allowable prices for puppies under the ordinance.  By limiting the price of puppies to

an amount that sellers of puppies from distant states cannot meet, the ordinance plainly has a

discriminatory impact upon out-of-state interests.  *See Dean Milk Co. v. Madison*, 340 U.S. 349

(1951).  Like the milk law at issue in *Madison*, "this regulation . . . in practical effect excludes

from distribution in [El Paso] wholesome [puppies] produced" elsewhere.  *Id.* at 354.  "In thus

erecting an economic barrier protecting a . . . local industry against competition from without the

State, [El Paso] plainly discriminates against interstate commerce."  *Id.*  While it is true that the

low price also likely thwarts the sale of pets in El Paso from other parts of Texas, this does not

change the fact that the ordinance discriminates against interstate commerce.  *See id.* at 354 n.4.

Because the ordinance discriminates, it is unconstitutional unless Defendant "can

demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local

interest." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 725 (5th Cir. 2004).  At this stage, Defendant has not made such a showing, as explained above under the Contracts Clause analysis.  At least one of Defendant's purposes is questionable, and the means chosen do not seem reasonably necessary to achieve the ordinance's proper purposes.  Thus, the Court finds that Plaintiff is sufficiently likely to succeed on the merits of this claim to warrant a restraining order.

Even if the law did not discriminate against out of state interests, the Court would still find that Plaintiff has established a likelihood of success on this claim.  The burden on interstate commerce here is significant, in that the ordinance will drive out of business the only pet store in the City that sells puppies obtained from other states.  The benefits, by contrast, are slight.  As described above, puppies from Plaintiff's store represent, at most, less than one percent of the number of strays the City is looking to reduce.  And realistically, given the price Plaintiff charges its customers for the animals, the actual percentage is probably close to zero.  Under the *Pike* test, because the benefit is so slight, the burden imposed here is clearly excessive.

### B.  Likely irreparable injury

A court may only issue injunctive relief if irreparable harm is "likely"; granting an injunction based on a mere possibility of remote injury is insufficient, even if a plaintiff has shown a nearly certain likelihood of success.  *Winter*, 555 U.S. 7, 129 S.Ct at 375.  This is because such an award would not square with the nature of injunctive relief "as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.*  Additionally, proof of an irreparable harm generally requires proof of an injury for which "there is no adequate remedy at law, such as monetary damages."  *Janvey v. Alguire*, No. 10-10617, --- F.3d ----, 2010 WL 5095506, at *12 (5th Cir. 2010).  "However, the mere fact that

14

economic damages may be available does not always mean that a remedy at law is "adequate." *Janvey*, 2010 WL 5095506, at *12.  Bankruptcy or even a substantial loss of customers and revenue, while numerically quantifiable, constitutes an irreparable injury, because if an injured party is driven out of business any final judgment the court might issue would be useless.  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  Similarly, an injury that threatens to terminate a franchise or otherwise threatens a party's ability to continue in business can constitute an irreparable injury.  *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (noting that franchisees want to sell products, "not to live on the income from a damage award"); *see also Nelson v. Nat'l Aeronautics and Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) (holding that constitutional violations generally qualify as per se irreparable injuries).

Here, Plaintiffs have submitted uncontroverted evidence that once they are required to comply with the price regulating provisions of the ordinance, they will suffer so much loss of business that they will be unable to continue in operation.  The evidence for this prediction, and its reasoning, are persuasive.  The evidence shows that Plaintiff derives a very significant portion of its revenue from puppies.  Once the ordinance applies to its sales of puppies, Plaintiff cannot even sell the puppies at cost, because to do so would place it in violation of the confidentiality provisions of the Agreement.  Therefore, Plaintiff would only be able to sell the puppies for a maximum of $150, which is not even enough to cover the costs of their transportation.  Rather than lose money on each sale Plaintiff will likely instead sell no puppies, which will so far reduce Plaintiff's revenue that, according to its predictions, it will be unable to meet its loan and rent obligations and the business will close.  Based on the evidence before it, the Court finds that

the operation of the ordinance is certain to drive Plaintiff entirely from business, which constitutes an irreparable injury.

### C.      Balance of equities

The balance of equities in this case is clear.  On Plaintiff's side, a restraining order will allow it to continue in business, pending further proceedings in this case, whereas no relief will lead to irreparable injury.  On Defendant's side, the harm from a restraining order is small.  As laid out above, given the numbers of puppies Plaintiff sells each year, and their cost, the chance of puppies sold by Plaintiff becoming strays is minuscule.  Moreover, it is not as though a restraining order in this case would lead to a rush of other pet retailers to obtain similar orders, or even push the City to voluntarily declare a moratorium on the enforcement of the ordinance. Plaintiff is the only retailer of pets in the City at this time, so a restraining order affects Plaintiff alone.

Additionally, Federal Rule of Civil Procedure 65(c) requires the Court to collect security from the moving party sufficient to cover the injury the injunction will impose on the non-moving party, in the event the injunction is found to have been wrongly entered.  Fed. R. Civ. P. 65(c).  Plaintiff has indicated a willingness to post such a bond for this purpose, which will help mitigate any harm caused to Defendant.

### D.      Public interest

Because Defendant is the government of the inhabitants of the City, the interests of the public necessarily overlap considerably with Defendant's interests.  Thus, the potential harm to the public interest is the same as the harm to the City: the possibility that more dogs might become strays.  On the other hand, unlike Defendant, the public does stand to benefit from an injunction in that the public may continue to buy puppies and other pets and pet supplies from

Plaintiff during the time the injunction is entered.  In light of the minimal potential harm and the possibility for public benefit, the Court finds that a restraining order would be in the public interest.

## III.   CONCLUSION

In sum, on the evidence before it at this time the Court finds that Plaintiff is likely to succeed on the merits of its claims, and will suffer irreparable injury if the ordinance is allowed to become fully effective.  The balance of equities favors Plaintiff, and a restraining order is in the public interest.

Accordingly, the Court hereby **GRANTS** in part Plaintiff's Application for a temporary restraining order, ECF No. 1.

Defendant is hereby **RESTRAINED** from enforcing Title 7, Chapter 7.14, Section 7.14.020 (Dog and cat sales and transfers) of the El Paso City Code against Plaintiff for a period of 14 days.

The Clerk is to issue notice to all Defendants that the hearing on Defendants' request for a preliminary junction is set for January 24, 2011, at 9:00 a.m.

Defendants **SHALL POST BOND** in the amount of $5,000.00.

This **ORDER** will expire on January 24, 2011, at 9:00 a.m.

**SO ORDERED**.

**SIGNED** on this day of January 10, 2011, at 9:00 a.m.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE